[Civ. No. 20138. Second Dist., Div. One. Dec. 7, 1954.]

MONOLITH PORTLAND CEMENT COMPANY (a Corporation), Appellant, v. J. R. GILLBERGH et al., Respondents.

Norman Elliott and Enright & Elliott for Appellant.

Elden C. Friel for Respondents.

MOSK, J. pro tem.*—This appeal from a judgment of dismissal, entered following the sustaining of respondents' demurrers without leave to amend and the granting of respondents' motion to dismiss, involves a conflict between a purported mining locator claiming rights under the general mining laws (30 U.S.C.A. § 22 et seq.) and a lessee under the Mineral Leasing Act of 1920 (30 U.S.C.A. § 181 et seq.).

Appellant is a manufacturer of cement and uses the mineral gypsum in its manufacturing process. At various dates during the decade following September 1, 1938, appellant filed locations on seven mining claims in Ventura County, principally adjacent to certain proven gypsum mines in operation. Appellant alleged that it, and earlier its assignor, performed all necessary assessment and development work upon the lands in question required by the federal mining laws.

Legal title to this land is vested in the United States. On June 26, 1946, respondent J. R. Gillbergh filed an application with the Bureau of Land Management, Department of the Interior, for an oil and gas lease under the Mineral Leasing Act of 1920, asserting that such land was valuable for oil and gas. (The bureau will be variously referred to herein and in cited cases as the Land Bureau, Land Department, Land Office and General Land Office.) The application was made under sections of the statute providing for the granting of exploration leases upon lands not within a known geologic structure.

Thereafter appellant filed with the Land Bureau a verified protest against the granting of the lease, pleading in its contest the seven mining claims involved herein, alleging that by virtue of the claims appellant had a vested right with which the United States could not interfere by the granting of the proposed oil and gas lease. The matter was heard in the Sacramento land office, and the assistant director of the Bureau of Land Management of the Department of Interior rendered his findings and decision on May 4, 1951, the holding

---

*Assigned by Chairman of Judicial Council.

being that the land was valuable for oil and gas and subject only to leasing under the Mineral Leasing Act, and that appellant's seven mining claims were null and void upon the ground, among others, that there was a lack of requisite discovery of minerals. Appellant's protest was dismissed. Upon appellant's motion for a new trial and later its appeal, the Secretary of Interior took over the matter and affirmed the determination in a 15-page decision written by the department solicitor under date of July 22, 1952.

When the decision became final, the United States executed the oil and gas leases to respondents. Thereafter appellant commenced an action in the Superior Court of Ventura County for ejectment and quiet title. Subsequently in its amended complaint it sought possession of the land by way of ejectment and declaratory relief as against the oil and gas lessees and their assignees.

Respondents demurred to the amended complaint, asked the trial court to take judicial notice of the prior proceedings in the Department of the Interior, maintained they constituted a final and conclusive adjudication of appellant's claims, and also, that the United States, as owner and lessor of respondents, was a necessary and indispensable party to the action, without the joinder of which the court had no jurisdiction of the action. The trial court, after receiving briefs and taking the matter under submission, sustained the demurrer without leave to amend and granted respondents' motion to dismiss. This appeal resulted. By stipulation the records of the Bureau of Land Management and the transcript of the hearing before that agency were included in the clerk's transcript on appeal in this proceeding.

It is clear that the law requires the court to take judicial knowledge of the official acts of the land office. (*Livermore* v. *Beal*, 18 Cal.App.2d 535 [64 P.2d 987], *Jones* v. *United States*, 137 U.S. 202 [11 S.Ct. 80, 34 L.Ed. 691]; *Leonard* v. *Lennox*, 181 F. 760 [104 C.C.A. 296].)

Two issues are raised by this appeal: (1) is the decision in the administrative proceeding in the Land Bureau a final and conclusive adjudication that appellant's mining claims are void; (2) is the United States a necessary and indispensable party to the action? We conclude both questions must be answered in the affirmative.

The Act of May 10, 1872, is the foundation of the existing system for acquiring rights in public mineral lands (*Reynolds* v. *Iron Silver Mining Co.*, 116 U.S. 687 [6 S.Ct. 601, 29 L.Ed

774]) and is the basis of appellant's assertion of rights herein, and its insistence that the Land Department had no jurisdiction to rule upon its mining claims.

Looking first to the Act of 1872, we find it provides that rights claimed thereunder are valid only insofar as not in conflict with laws of the United States. (30 U.S.C.A. §§ 22 and 26.)* Since whatever rights obtained by appellant were acquired in 1938 and after, none were vested prior to enactment of the Leasing Act of 1920. Thus whatever course it pursued was with knowledge that the lands were subject under pertinent circumstances to disposition in accordance with the terms of the Leasing Act of 1920.

Appellant insists the Land Office had no jurisdiction over mining claims, and cites the case of *Double Eagle Mining Co.* v. *Hubbard,* 42 Cal.App. 39 [183 P. 282], as authority. That case, however, was decided in 1919, prior to the Leasing Act of 1920 which set up the mechanics for hearing contests. Pursuant to the latter act, the appellant itself invoked the jurisdiction of the Land Office by instituting its challenge to respondents' petition for a lease and by participating in protracted hearings and an appeal. Appellant put in issue in the administrative proceeding the validity of its claims by asserting that respondents' application would interfere with appellant's "vested right to the exclusive possession of each of said mining claims." In order to ascertain the merit of appellant's protest, it was obviously necessary for the Land Department to decide the validity of the mining claims.

The controlling authority in this situation is *Cameron* v. *United States,* 252 U.S. 450, 459 [40 S.Ct. 410, 64 L.Ed. 659, 662.] In that case the Commissioner of the General Land Office held that the land involved was not mineral, that Cameron had not made the requisite discovery of minerals, and that his claim was invalid. The Secretary of the Interior affirmed the decision on appeal. On injunction proceedings brought by the government to oust Cameron and restrain

---

*Section 22 reads in part as follows: ". . . all valuable mineral deposits in lands belonging to the United States, . . . shall be free and open to exploration . . . by citizens of the United States . . . according to the local customs or rules of miners in the several mining districts, *so far as the same are applicable and not inconsistent with the laws of the United States.*"

Section 26 reads in part as follows: "The locators of all mining locations . . . *so long as they comply with the laws of the United States,* and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations . . ." (Italics ours.)

his use of the land, he contended that the Land Department had no jurisdiction to rule upon the validity of his mining claims. The court disposed of that contention in the following manner:

"The second objection rests on the naked proposition that the Secretary was without power to determine whether the asserted lode claim, under which Cameron was occupying and using a part of the reserves to the exclusion of the public and the reserve officers, was a valid claim. We say 'naked proposition,' because it is not objected that Cameron did not have a full and fair hearing, or that any fraud was practiced against him, but only that the Secretary was without any power of decision in the matter. In our opinion the proposition is not tenable.

"By general statutory provisions the execution of the laws regulating the acquisition of rights in the public lands and the general care of these lands is confined to the Land Department, as a special tribunal; and the Secretary of the Interior, as the head of the Department, is charged with seeing that this authority is rightly exercised to the end that valid claims may be recognized, invalid ones eliminated, and the rights of the public preserved. [Citing cases.]

"A mining location which has not gone to patent is of no higher quality and no more immune from attack and investigation that are unpatented claims under the homestead and kindred laws. If valid, it gives to the claimant certain exclusive possessory rights, and so do homestead and desert claims. But no right arises from an invalid claim of any kind. All must conform to the law under which they are initiated; otherwise they work an unlawful private appropriation in derogation of the rights of the public.

"Of course, the Land Department has no power to strike down any claim arbitrarily, but so long as the legal title remains in the government it does have power, after proper notice and upon adequate hearing, to determine whether the claim is valid, and, if it be found invalid, to declare it null and void."

There is no question that due process was observed here. ▋ Due process in this situation implies notice and a hearing. Such hearing must not of necessity be in the courts; it may be before the appropriate administrative agency. (*Orchard* v. *Alexander*, 157 U.S. 372, 383 [15 S.Ct. 635, 39 L.Ed. 737, 741] ; *Michigan Land & Lbr. Co.* v. *Rust*, 168 U.S. 589, 593 [18 S.Ct. 208, 42 L.Ed. 591, 593].)

Appellant devotes considerable effort to attacking the decision of the Secretary of the Interior and particularly his finding that the evidence was insufficient "to show that discoveries of valuable mineral deposits had been made." We believe the department's opinion to be generally sound. "The test to be applied," states the opinion, "in determining whether a particular tract of land was known at a given time to be valuable for one of the minerals named in the Mineral Leasing Act is not whether an actual discovery of such mineral on the land had been made as of the significant date, but rather whether the known conditions at the time were such as would have supported the belief that the land contained the mineral in such quantities and of such quality as to make its extraction profitable and to justify expenditures to that end." This is consistent with the law, as stated in *Montana Cent. Ry. Co.* v. *Migeon*, 68 F. 811, 814 [23 C.C.A. 156]: "The vein or lode which the statute directs must be discovered before the location of a claim must be one that, from all its indications, has a present or prospective commercial value, for only 'lands valuable for minerals' are subject to appropriation as mining claims."

■ It is fundamental that whether the requisite discovery of minerals has been made, or whether the necessary potential exists within the intent of the law, are questions of fact for the Land Department. In the absence of extrinsic fraud or mistake, its determination is a final and conclusive adjudication of those questions. (*Cameron* v. *United States, supra.*) As stated in *Wetsel* v. *Superior Court*, 119 Cal.App.2d 703, at 709 [260 P.2d 242]: ". . . the question of whether or not the land was mineral in character or whether there had been a sufficient discovery of mineral to characterize the land as mineral are questions of fact to be determined by the General Land Office (citing cases), and the final decision of General Land Office upon the mineral or nonmineral character of land is conclusive." In *Martin* v. *Bartmus*, 189 Cal. 87, 91 [207 P. 550], the parties by their pleading "attempt to put in issue the same matters which were decided adversely to them by the Department of the Interior. This, under the foregoing authorities, they cannot be permitted to do." As stated in *Sullivan* v. *Mammoth Oil Co.*, 22 F.2d 663, 665, "So long as the title to public lands is in the United States the courts will refuse to interfere with the Land Department in its administration."

■ The second question raised on appeal must also be

resolved in favor of the trial court's conclusion: the failure to name the United States as a party to the action is a fatal omission. Significantly, it was a party to the proceeding in the Land Department in which appellant's protests were rejected.

*Livermore* v. *Beal, supra,* (certiorari twice denied by the *United States Supreme Court,* 302 U.S. 712 [58 S.Ct. 32, 82 L.Ed. 550] and 302 U.S. 777 [58 S.Ct. 260, 82 L.Ed. 601]) is persuasive authority to the effect that the United States is an indispensable party to the action. While it was a case involving claims to legal title rather than mere possessory rights, many of the authorities relied upon therein were concerned with leases and equitable title. In *Wilson* v. *Elk Coal Co.,* 7 F.2d 112, at 113, the court said, ". . . we are clearly of opinion that the courts are without jurisdiction to grant relief in favor of one claiming only an equitable title, as against a party in possession under a lease from the United States, so long as the title remains in the United States." *Peale* v. *Davis,* 19 F.2d 695 [57 App.D.C. 221], involved a license; *Skeen* v. *Lynch,* 48 F.2d 1044, was a proceeding by a patentee seeking oil and gas rights; *Sullivan* v. *Mammoth Oil Co., supra,* directly involved rights of locators of placer mining claims; *Wood* v. *Phillips,* 50 F.2d 714, was concerned with possession and an injunction against trespass. In all of the foregoing cases, it was held that the United States was an indispensable party to the action.

Appellant has here attempted to circumvent the requirement of naming the United States by changing his causes of action from ejectment and quiet title to ejectment and declaratory relief. This latter device, however, does not change the purpose sought by appellant: to acquire undisturbed possession as against the lessee of the holder of legal title. An attempt to use equity for the purpose of acquiring possession was made in *Frost* v. *Spitley,* 121 U.S. 552 [7 S.Ct. 1129, 30 L.Ed. 1010, 1012], but the court there held, "A person out of possession cannot maintain such a bill, whether his title is legal or equitable; for *if his title is legal,* his remedy at law, by way of ejectment, is plain, adequate and complete; and if his title is equitable, he must acquire the legal title, and then bring ejectment. (Citing cases.)" (Italics ours.) This case was cited with approval in *Wood* v. *Phillips, supra,* p. 716. In California, the law generally requires legal title for an ejectment action (17 Cal.Jur.2d 178.)

Whatever the pleading nomenclature, the result of a decree for appellant would be a cloud on the title of the United States, a limitation on its rights of ownership, and the lessees would be subject to ouster if they continued to attorn to the United States. (*Skeen* v. *Lynch, supra,* at p. 1046.)

Appellant has cited only two cases in support of its position that the United States is not an indispensable party to these proceedings. In one, *Brown* v. *Standard Oil Co. of Indiana,* 96 Colo. 554 [45 P.2d 639], the issue was neither raised nor discussed. In the other, *Graham* v. *Superior Court,* 131 Cal.App. 579 [21 P.2d 621], the court merely maintained its authority to determine possessory rights pending the outcome of a contest in the general land office. " 'To say that no relief can be granted,' " said the court at p. 583, " '. . . *pending the settlement of title in the land department,* would . . . place a premium upon greed and the use of force, . . . ' " (Italics ours.) Every case cited within the *Graham* opinion limited the jurisdiction of the court to protection of one's right of possession until the government heard and ruled on the conflicting claims. The phraseology differed, but the conclusion in each was the same: ". . . until such time as the government, . . . puts forever at rest the title to the lands" (*Sproat* v. *Durland,* 2 Okla. 24 [35 P. 682, 689] ; ". . . until the government parts with its title" (*Fulmele* v. *Camp,* 20 Colo. 495 [39 P. 407, 408]) ; ". . . until the Land Department hears and determines the question as to the character of the land" (*Bay* v. *Oklahoma Southern Gas, Oil & Min. Co.,* 13 Okla. 425 [73 P. 936, 939] ; ". . . until the controversy is finally determined by that department"; (12 Am. & Eng.Ann. Cases 32).

There is a sound basis for the foregoing rule. Were courts reluctant to intervene during the period of vacuity before disposition of claims by the government, a premium would be placed upon force, and in some instances violence and bloodshed might follow. But after the merit of conflicting claims has been determined, the courts have no jurisdiction unless the holder of legal title to the property, the United States, is made a party to the action.

We therefore conclude that the trial court properly ruled on the motions before it.

The judgment is affirmed.

White, P. J., and Drapeau, J., concurred.